RAWLS, Acting Chief Judge.
Petitioner Berkley challenges an order entered by respondent, Department of Environmental Regulation (department) denying his application for a permit to construct a seawall and fill his privately owned lands.
The following two points posed by petitioner viz.:
The department erroneously denied Berk-ley’s application on the ground that it did not comply with the requirements of Section 258.165, Florida Statutes, the Biscayne Bay Aquatic Preserve Act.
and
Berkley established by the overwhelming weight of the evidence that his proposed filling is necessary to enhance the utility and quality of the preserve,
are meritorious.
In 1974, by enactment of Chapter 74-171, the legislature created the Biseayne Bay Aquatic Preserve.[1] The subject property is located within the boundaries set forth in said chapter. Section 258.165(3)(b), Florida Statutes, provides, inter alia:
“(b) No further dredging or filling of submerged lands of the preserve shall be approved or tolerated by the Board of Trustees except:

2. Such other alteration of physical conditions as may be necessary to enhance the quality or utility of the preserve.
In reviewing petitioner’s application the hearing officer and the secretary, in adopting the hearing officer’s recommendations with modification in the final agency order, found that the Biseayne Bay Aquatic Preserve Act was applicable to- the subject property.
A comprehensive Florida Aquatic Preserve Act[2] incorporating previously established aquatic preserves, including the Biseayne Bay Aquatic Preserve, was enacted by the legislature in 1975 (Chapter 75-172). This later act expressly excludes all privately owned submerged lands with the provision that the board (Board of Trustees of Internal Improvement Trust Fund) “may negotiate an arrangement with any such private owner by which such land may be included in the preserves.”[3] The hearing officer, in his recommended order, found that the following language in Section 258.-39, Florida Statutes, viz.:
“(11) Biseayne Bay-Cape Florida to Monroe County Line Aquatic Preserve, as described in the Official Records of Dade County in Book 7055, pages 852-856, less, however, those lands and waters as described in s. 258.165.”
“specifically exempts therefrom those lands and waters as described in Section 258.165, Florida Statutes, which is the Biseayne Bay Aquatic Preserve Act. Accordingly, the Biseayne Bay Aquatic Preserve Act is expressly excluded from Chapter 75-172, Laws of Florida [Sections 258.35-258.46, Fla.Stat.].” He erred. The language above quoted clearly exempts the Biseayne Aquatic Preserve from the boundaries of the newly established Biseayne Bay-Cape Florida to Monroe County Line Aquatic Preserve. However, it does not exclude the Biseayne Bay Aquatic Preserve from the provisions of the later act. Subsection (27) under the same Section 258.39 specifically includes “the Biseayne Bay Aquatic Preserve, as established by s. 258.165” as being within the purview of the Florida Aquatic Preserve Act.[4]
*554 The rule of statutory construction applicable to the two statutes now being considered was cogently stated in Sparkman v. State:[5]
“ . . . Where there is material repugnance in statutory regulations, or where there is anything from which an intent that a later act shall supersede a prior act may be fairly inferred, it will be given that effect, particularly when the later act covers a broader general subject and contains a portion of the particular provisions of the former act, and adds to some portions and omits other portions of such particular provisions so as to make such particular regulations contained in the prior act conform to the purpose and policy of the later act, covering a broader subject, including the lesser.” (emphasis supplied)
The 1974 Biscayne Bay Aquatic Preserve Act encompassed only a single subject, the Biscayne Bay Aquatic Preserve, which incorporated the “body of water in Dade and Monroe Counties known as Biscayne Bay”. Thus, all property privately owned and publicly owned was included by the terms of the 1974 act (except those submerged lands conveyed to the United States for the establishment of the Biscayne National Monument). The Florida Aquatic Preserve Act of 1975 established aquatic preserves among numerous areas of Florida’s extensive sea-shorelines. Thus, the later act is a subsequent general act that specifically defined “Boundaries of preserves”[6] as:
“the submerged lands included within the boundaries of . Dade . Monroe . . . Counties, as hereinafter described [the Biscayne Bay Aquatic Preserve, as established by s. 258.165] with the exception of privately held submerged lands lying landward of established bulkheads . . . .” (emphasis supplied)
The subject lands admittedly being privately held and lying landward of the established bulkhead, the provisions of Section 258.39, Florida Statutes, clearly excluded them from the Biscayne Bay Aquatic Preserve Act of 1974.[7] In view of our construction of the foregoing statutes, we do not reach petitioner’s constitutional question.[8]
We next consider the evidentiary question. The subject property was conveyed to Berkley on April 17, 1974, by his immediate predecessor in title who acquired same by a conveyance from the Board of Trustees of the Internal Improvement Trust Fund in 1964.[9] The application by *555 Berkley sought to fill approximately two acres seaward of uplands owned by him to the established bulkhead line with material to be hauled in from uplands. This property is the only privately owned submerged land in the area that has not been bulk-headed and filled. At the evidentiary hearing upon his application, Berkley submitted the testimony of two highly qualified expert witnesses, Dr. Howard Teas[10] and Mr. George Love.[11] A biological report on the San Souci Estate Site on Biscayne Bay (the subject property), authored by Dr. Teas, was introduced into evidence. The testimony of Dr. Teas explained in detail a survey made of the property to see what appeared to be biologically valuable, which substantially reflected the following: That the subject submerged property has been in years past substantially altered by the excavation of large pits; that the crux of his findings, from a biological view, was the extreme depths of the water (the water is rarely clear enough to see more than six feet); by diving he found depths up to 20 feet just offshore; in checking dissolved oxygen levels with a calibrated probe at six stations, he consistently found a deficiency of oxygen below a standard minimum of five parts per million — the bottoms were anaerobic. In summary, Dr. Teas testified that in the current state, the water quality of the area is poor and unproductive.[12] Mr. George Love testified in detail as to the engineering plans for containing storm water on Berkley’s property after same was filled. At one point he categorically stated: “ . . .no storm water will go into the Bay directly.” This witness further testified that there “will be a vast improvement over what’s there now, because in the case of a vary hard rain, a considerable amount of runoff now exists from the land into the Bay.” The evidence reflects that Dr. Teas and Mr. Love worked closely in devising the proposed plan for mangrove plantings and rip rap construction that will encourage aquatic growth, which plan had been accepted and approved by Berkley.
Mr. Brian Barnett,[13] the sole witness adduced by the department, testified that he was employed by the Game and Fresh Water Fish Commission as an environmental specialist. His testimony was that the area is basically in nature to that which Dr. Teas testified to. This witness further stated that a field representative of the com *556 mission had told him that the shoreline area of Biscayne Bay was a relatively productive area. As to Berkley’s proposed rip rap plan, Mr. Barnett stated that his department had not envisioned:
“ . . .a plan as ambitious as this one basically because the cost involved in this one usually would not be undertaken by a developer, just because some State agency thinks it’s a great idea, put mangroves in or put seedlings, but it’s certainly a great improvement . . . Over at least what is typically done, yes.”
The only other evidence offered in opposition to the application was a letter from the Game and Fresh Water Fish Commission and a letter from the Department of Natural Resources. These letters basically set forth unsupported conclusions of adverse effect.
The secretary adopted the hearing officer’s recommendations with modifications which are not material to our conclusion; such final agency action being primarily founded upon the provisions of Section 258.-165, Florida Statutes, which we have previously concluded is not applicable to the subject property.
It is well settled that we may not substitute our judgment for the agency; however, it is our responsibility to determine whether the findings of fact and conclusions of law of the agency are supported by competent substantial evidence and to set aside such action which is not so supported. This record with clarion clarity demonstrates the necessity for judicial review of final administrative action which ignored the almost uncontroverted testimony adduced by the petitioner. Clearly, the manifest weight of the evidence presented by Berkley required a finding that the project would enhance quality or utility of the preserve. At the final hearing before the secretary of the department, counsel for the department cogently summarized the evidence in this proceeding when he stated:
“Mr. Berkley wants to fill may be two acres or a little less than that actually, but he’s willing to go out and improve and enhance outside his project. He is willing to go out and do a project that will actually enhance the bay and in my judgment improve the habitat that was lost. He’s willing to put in rip raps and mangroves and take the deep anoxic areas, fill them in so that the grasses can come back, and improve and actually enhance the bay.
“The thing that I thought was perhaps most impressive — it’s a sparsely vegetated bottom right now. The most that it has to offer, as the Game and Fresh Water Fish commented, that there was a feeding habitat there but this will be replaced.”
Assuming, arguendo, that Section 258.-165, Florida Statutes, is applicable to Berk-ley’s property, we find that the department erred in denying the instant application.
The petition for review is granted and the final order of the Department of Environmental Regulation is quashed with directions that the department grant Berk-ley’s application.
McCORD, J., and McDONALD, PARKER LEE, Associate Judge, concur.

. Section 258.165, Fla.Stat. (1975).

. Sections 258.35-258.46, Fla.Stat. (1975).

. Section 258.40(1), Fla.Stat. (1975).

.It is significant that this subsection also defines the Pinellas County Aquatic Preserve and Boca Ciega Aquatic Preserve. This subsection provides as to the Pinellas and Boca Ciega Aquatic Preserves: “If any provision of this act is in conflict with the aquatic preserves *554 established by s. 258.16 and Chapter 72-663, Laws of Florida, the stronger provision for the maintenance of the aquatic preserve shall prevail.” The above quoted subsection does not provide and is void of any language that the old Biscayne Bay Aquatic Preserve Act will control if in conflict with the later statute.

. Sparkman v. State, 71 Fla. 210, 71 So. 34, 39 (1916).

. Section 258.39, Fla.Stat. (1975).

. Sec. 258.39, Fla.Stat., also provides in the last paragraph of this section: “Any and all submerged lands theretofore conveyed by the Trustees of the Internal Improvement Trust Fund . . . and any and all uplands now in private ownership are specifically exempted from this dedication.”

. Petitioner further argues that: “The Biscayne Bay Aquatic Preserve Act, assuming that it is applicable to Berkley’s application, is unconstitutional.” As noted, the act purports to place the burden upon a private landowner to demonstrate that filling submerged land will “enhance the quality or utility of the preserve” prior to the granting of a permit to fill. The Supreme Court in Zabel v. Pinellas County Water and Nav. Con. Auth., 171 So.2d 376 (Fla.1965), in an extensive opinion, established that such a statutory burden would render the statutory provision unconstitutional.

.Berkley contends at the outset that pursuant to this court’s opinions in Askew v. Taylor, 299 So.2d 72 (Fla. 1st DCA 1974), and Kirk v. Gables By the Sea, Inc., 251 So.2d 880 (Fla. 1st DCA 1971), that the department is estopped from denying his permit. In support of this argument, Berkley contends that the record reflects that at the time his predecessor in title purchased the subject property from the Trustees that it was the intention of the parties filling would take place out to the bulkhead line, citing the following finding of the hearing officer’s recommended order:
“The property in question was conveyed to Berkley’s immediate predecessors in title by *555 the Trustees in 1964 pursuant to a contract for land purchase executed in 1961. The Trustees contracted to sell, and sold, the property to Berkley’s predecessor in title after receiving the buyer’s application to purchase which expressed the buyer’s intent to bulkhead and fill the property. At the time in question all submerged land sold by the Trustees was with the understanding that the property would be bulkheaded and filled.”
In view of our decision herein, we find it unnecessary to pass upon this point posed by Berk-ley.

. Dr. Teas, a professor of biology at the University of Miami and biology consultant, is the holder of a bachelor’s degree in biology from Louisiana State University; a master’s degree in biology from Stanford; and a doctorate in biology from the California Institute of Technology. He has conducted extensive biological research in the Biscayne Bay area with federal support on the productivity of Biscayne Bay, grassbeds activity, and the productivity of mangrove areas. He is also the author of several publications on mangroves and estuarive matters.

. Mr. George Love is a graduate engineer from Georgia Tech and has practiced his profession for 35 years.

. The testimony of Dr. Teas was supported by the deposition of Mr. William Kidd, a professional engineer who was Executive Director of the Trustees of the Internal Improvement Trust Fund at the time the subject property was sold to Berkley’s predecessor in title. Mr. Kidd testified that it is essential that bulkheads be completed in order to obtain a smooth, uniform bulkhead line. Otherwise, jagged recessed areas such as the property in question are created which collect debris and trash and cause sanitation problems. According to Mr. Kidd, the filling of the land on each side of the property and the existence of two spoils fingers have further affected the property by removing it from normal flushing action of the bay’s waters. In Mr. Kidd’s opinion, the bulkheading and filling of the property are necessary to prevent the collection of garbage and trash and to facilitate the rapid flow of water along the shore in order to flush out potential pollutants.

. Mr. Barnett is a graduate of the University of South Florida and holds bachelor’s and master’s degrees from that institution.